**Hajar GODWIN, Plaintiff,**

v.

**VISITING NURSE ASSOCIATION HOME HEALTH SERVICES, Defendant.**

**Civ. A. No. 92–6339.**

United States District Court, E.D. Pennsylvania.

Sept. 15, 1993.

450

Robert W. Small, Berlinger & Small, Abington, PA, Catherine Votaw, Asst. U.S. Atty., Philadelphia, PA, for plaintiff.

Frank P. Murphy, Katz Murphy Oliver D'Aniello and Farrell, Gerard T. Rosso, Murphy & Oliver, Norristown, PA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

Following a bench trial, the court makes the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1. Plaintiff, Hajar Godwin (Godwin), is a former employee of the defendant.

2. Defendant, Visiting Nurse Association Home Health Services (VNA), is a Pennsylvania nonprofit corporation with offices in Norristown, Pennsylvania.

3. VNA is in the business of providing home nursing care and home health aides to patient-clients.

4. VNA provides skilled nursing care, home health aides, and other services to individuals, some of whom are covered by the Federal Medicare Program. VNA is entitled to reimbursement under the Medicare Program for some, but not all, of the services it provides.

5. VNA also operates one or more primary health care facilities as a separate part of its business. At these facilities VNA of-

fers medical, dental, and other services to the public.

6. At all material times, VNA was not entitled to reimbursement under the Medicare Program for any portion of the services rendered through its primary health care facilities.

7. Beginning June 7, 1988, VNA employed Godwin as a bookkeeper-accountant. Godwin's job duties included preparation of various reports, payroll information, financial reports, and accounting and billing information. The plaintiff's duties included providing information and documents to be used to prepare cost reports to be submitted by VNA to Independence Blue Cross (IBC). The cost reports were used by VNA to secure reimbursement under the Medicare Program.

8. IBC is a financial intermediary between the United States Government and Defendant. IBC reviews and approves cost reports submitted by Medicare providers. IBC reviews these reports to determine the accuracy and the appropriateness of the charges for Medicare reimbursement.

9. Godwin represented to VNA that she had a Masters of Business Administration degree. She submitted a photocopy purporting to show her MBA degree. Godwin never received her MBA. Def.Ex. 2.

10. VNA had some dissatisfaction with Godwin's work and work product. Nevertheless she received four raises. (Sept. 1988—$12; Nov. 1988—$14; June 1990—$20; Feb. 1992—$23). The last raise came only four months before her termination. At that time, Godwin received a 15% raise. Godwin was the second highest paid person at VNA. Only Agnes Ferrara (Ferrara), VNA's Executive Director, made more money.

11. Ferrara had a very strong policy and practice through which she worked to control operational details at VNA.

12. On December 31, 1991, VNA received a letter from IBC dated December 30, 1991. The letter was addressed to Ferrara. This letter announced adjustments made by IBC with respect to VNA's 1990 fiscal year. This letter also requested additional information concerning the 1990 fiscal year cost report.

IBC sought information concerning VNA's treatment of the expenses of consultants.

13. On January 8, 1992, Ferrara responded to IBC's letter. She knew about IBC's inquiry concerning these matters from that point.

14. VNA engaged Joanne Chicco ("Chicco") to prepare its cost reports. Chicco prepared the 1990 cost report.

15. Godwin's duty was to provide Chicco with VNA information and records for use in preparation of the cost reports. Chicco was responsible for preparing the cost reports.

16. The December 30, 1991 letter from IBC to VNA was referred to Chicco for response.

17. Chicco did not respond to the request. Between January 8, 1992 and April 8, 1992, IBC made repeated oral requests for the back up documentation called for by the December 30, 1991 letter. IBC orally requested invoices of Jack Nelson (Nelson), a VNA consultant. IBC wanted to review these invoices to determine if VNA's accounting of Nelson's fees was appropriate.

18. On April 8, 1992, IBC again wrote to Ferrara extending the deadline for submission of such documents to April 13, 1992.

19. On April 13, 1992, Chicco, on behalf of VNA, responded with certain information. Nelson's 1990 invoices were not included in the material provided.

20. On June 18, 1992, IBC again wrote to Ferrara with a final request for the information originally sought in its December 30, 1991 letter.

21. VNA's cost report for fiscal year 1990 claimed approximately sixty-six percent (66%) of Nelson's fees as a Medicare reimbursable cost item. Reimbursement for fifteen point seven percent (15.7%) of Nelson's fees was not sought by VNA as it attributed this percentage of Nelson's services to fundraising activities by Nelson. The final eighteen percent (18%) of Nelson's fees also were not sought by Defendant. This percentage of his services were attributed to VNA's primary health care operations which were not covered under the Medicare contract.

22. VNA knew that fundraising activities of Nelson were not reimbursable under Medicare.

23. On June 19, 1992, Chicco informed Godwin it would be necessary for VNA to create false invoices indicating that Nelson performed administrative services on behalf of Defendant during 1990 to substantiate the inclusion of any of Nelson's charges, and that she, Chicco, would have nothing to do with it and that creating the false invoices was a matter between Godwin and Ferrara.

24. During 1990, Nelson submitted detailed day-by-day monthly invoices to VNA. These invoices indicate that substantially all of his services during 1990 were related to fund-raising. Pl.Ex. 8.

25. Fund-raising consultation services were not properly included in VNA's cost report for 1990.

26. At approximately noon on June 19, 1992, Chicco also informed Godwin that it would be necessary to create mileage logs for automobiles used by Ferrara, the cost of which had been included in the 1990 cost report.

27. On June 19, 1992, Godwin telephoned VNA's Board President with concerns regarding the 1990 cost report.

28. On June 19, 1992, Godwin stated to another VNA employee that she believed she was going to be required to make and sign falsified documents.

29. At approximately 3:30 or 4:00 p.m. on June 19, 1992, Godwin informed Ferrara of Chicco's advice as to the necessity of creating false invoices for Nelson evidencing performance of administrative services and automobile logs. Godwin informed Ferrara that she would not participate in creating nor preparing such documents because, to Godwin's knowledge, Nelson, in fact, did not perform administrative services during 1990. Godwin stated she would not create false documents and that she did not have the information to prepare the automobile logs for Ferrara's car.

30. Ferrara directed Godwin to prepare such false documents. Ferrara threatened to terminate Godwin's employment if Godwin refused.

31. Godwin refused to prepare such documents. As a direct result of that refusal, Ferrara summarily terminated her employment effective Friday, June 19, 1992.

32. On Monday, June 22, 1992, Godwin anonymously called IBC. She asked how she would report fraud. She stated that "she was just fired from the [health] provider because she would not falsify information that was reported on the cost report." Pl. Ex. 9.

33. After Godwin was terminated, Ferrara caused invoices to be prepared purporting to be those of Nelson. These new invoices made up a fictitious account of Nelson's performance of administrative services during 1990. These invoices failed to list Nelson's fundraising activities. Ferrara caused Nelson's total charges for each month during 1990 to be attached to these created documents. Ferrara submitted these documents to IBC. Pl.Ex. 7.

34. VNA did not submit Nelson's actual detailed invoices for 1990 showing his fundraising activities to IBC.

35. Ferrara submitted Nelson's newly created invoices so that VNA would be reimbursed for the full amount of Nelson's charges during 1990. Ferrara intended IBC to believe that all of Nelson's fundraising services in 1990 were attributable to reimbursable administrative services and that none of Nelson's services were attributable to non-reimbursable fundraising services.

36. VNA breached its duty to ascertain the accuracy of documentation submitted to IBC and to be sure that VNA submitted only accurate and not misleading information to IBC.

37. VNA breached its duty to determine whether its cost reports submitted to IBC were accurate and otherwise not misleading.

38. VNA knew that the recreated invoices of Nelson were inaccurate and misleading in that they failed to demonstrate that Nelson had performed substantial fundraising activities during 1990.

39. VNA submitted false and inaccurate documents to IBC for the purpose of securing reimbursement under the Medicare Program. VNA knew it was not lawfully entitled to these payments.

40. IBC relied on the "recreated" Nelson invoices submitted by VNA. IBC determined that VNA did not have to set off 15.7% of Nelson's fees. As a result, VNA received and accepted reimbursement for Nelson's non-reimbursable fundraising activities.

41. At all material times, Ferrara and Chicco acted within the scope of their authority for VNA.

42. VNA terminated Godwin's employment because she refused to participate in the creation and submission of false documents to IBC.

43. At the time Godwin was discharged by VNA, she was an employee, and not an independent contractor, of VNA. Godwin did her work in an office supplied by VNA at their headquarters. Her hours and days off were controlled by VNA. At all material times, VNA not only controlled the results of the work done by Godwin, but also had the right to direct the way in which it was done. The employer provided an office and supplies. Godwin performed routine bookkeeping functions. Godwin never had exclusive control of the manner of performing the work assigned to her. She was not responsible just for the results. Ferrara told Godwin what to do, when to do it, and how to do it. There was no material change in Godwin's status after her label changed from employee to independent contractor.

44. At the time Godwin was discharged by VNA, she was earning $23.00 per hour. She would have received a 4% pay raise during the relevant period, based on past experience.

45. Godwin's regular work hours were from 8:00 a.m. to 3:30 p.m., Monday through Friday.

46. Godwin's average work month consisted of 184 hours. Def.Ex. 9.

47. As a result of her discharge, Godwin lost wages from the date of her termination through the date of trial totalling $62,400.00, to which she is entitled, with interest on the back pay, litigation costs and reasonable attorneys' fees. Plaintiff tried to mitigate her damages, but was unsuccessful.

48. VNA violated the False Claims Act by terminating Godwin.

49. VNA wrongfully terminated Godwin for reasons which were against the public policy of the Commonwealth of Pennsylvania.

50. No punitive damage award is appropriate in this case. The award of twice Godwin's back pay provided under the False Claims Act suffices to punish and deter VNA.

51. Godwin performed services worth $2,024.00 for VNA prior to her termination for which Godwin has not received compensation. Pl.Ex. 17. Godwin is also entitled to recover a 10% penalty on these wages ($202.40) and her reasonable attorneys' fees.

52. VNA's failure to pay these wages was not in good faith. Therefore, the plaintiff is entitled to $506.00 as liquidated damages.

## II. CONCLUSIONS OF LAW

1. Fundraising consultation services are not compensable under the Medicare Program.

2. VNA is liable for the acts of its agents acting within the scope of their agency. 42 U.S.C.A. § 1320a–7a(*l*).

3. In determining whether a person is an independent contractor or an employee, the court's decision must be based on what the relationship "really was under the facts and applicable rules of law" and not in the way in which the parties regarded this relationship. *Jones v. Century Oil U.S.A., Inc.,* 957 F.2d 84, 86 (3d Cir.1992). A person is an employee, if his master not only controls the results of the work, but has the right to direct the way in which it shall be done. *Id.* "Broadly stated, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor. It is not the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control which renders one a servant rather than an independent contractor." *Moon Area Sch. Dist.*

*v. Garzony,* 522 Pa. 178, 190, 560 A.2d 1361 (1989); *see also Jones,* 957 F.2d at 86.

4. It is a violation of Federal law to present or cause to be presented to an agent of the United States a claim for a medical item or service that a person knows or should know was not provided as claimed. 42 U.S.C. § 1320a–7a(a)(1)(A).

5. It is illegal to knowingly and willfully make or cause to be made any false statement or representation of a material fact in any application for payment under the Medicare Program. 42 U.S.C. § 1320a–7b(a)(1), (2).

6. The False Claims Act makes it unlawful for an employer to discharge an employee because the employee refuses to participate in submitting false claims under the Federal Medicare Program and makes an intracorporate complaint. *See* 31 U.S.C. § 3730(h); *Passaic Valley Sewerage Commissioners v. United States Dept. of Labor,* 992 F.2d 474, 478–80 (3d Cir.1993).

7. An employee unlawfully terminated under the False Claims Act "shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). This relief includes reinstatement with the same seniority status she would have had but for the discrimination, two (2) times the amount of back pay, and interest on the back pay. *Id.* Additionally, the employee shall also receive any special damages sustained as a result of the employer's discrimination, including litigation costs and reasonable attorneys' fees. *Id.* Pursuant to section 3730(h), Godwin is entitled to recover twice her lost wages, reinstatement, and attorneys' fees and costs she has incurred in prosecuting this lawsuit.

8. Under Pennsylvania law, a cause of action exists for wrongful discharge, when the employer's dismissal of the plaintiff violates well-established public policy. *See Geary v. United States Steel Corp.,* 456 Pa. 171, 184, 319 A.2d 174 (1974); *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699 (3d Cir.1988).

9. Under Pennsylvania's Wage Payment and Collection Act, in addition to re-payment of her back wages, Godwin is entitled to recover a ten percent (10%) penalty ($202.40) and her reasonable attorneys' fees. 43 Pa.S.A. 260.9a(c, f).

10. Under Pennsylvania's Wage Payment and Collection Act, if the defendant's failure to pay the back wages was not in "good faith," then the plaintiff is entitled to liquidated damages. 43 Pa.S.A. § 260.10. Liquidated damages are defined as an amount equal to 25% of the total wages due or $500, whichever is greater. *Id.*

### JUDGMENT

AND NOW, this 15th day of September, 1993, it is hereby **ORDERED** that judgment is entered in favor of Hajar Godwin, plaintiff, and against Visiting Nurse Association Home Health Services, defendant, in the amount of $127,532.40, together with interest on the back pay, litigation costs and reasonable attorneys' fees.

Defendant shall reinstate plaintiff to her former position, with the same seniority status she would have had but for the discrimination.