Donald JONES, Lot 8–Maple Estates Pocono Lake, PA 18348,

Lisa Anne Jones, Lot 8–Maple Estates Pocono Lake, PA 18348,

v.

CENTURY OIL U.S.A., INC., 111 Clifton Avenue, Clifton, NJ 07013.

CENTURY OIL U.S.A., INC., Third Party Plaintiff,

v.

Gary A. FLEMING, d/b/a House Scene, Inc., Third Party Defendant,

Donald Jones and Lisa Anne Jones, Appellants.

No. 91–5287.

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1991.

Decided Feb. 21, 1992.

Brian L. Lincicome, (argued), Cozen & O'Connor, Philadelphia, Pa., for appellants.

Paul E. Smith, (argued), Fine, Wyatt & Carey, Scranton, Pa., for appellee.

Before GREENBERG, ALITO and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Appellants Donald and Lisa Jones, citizens of the Commonwealth of Pennsylvania and residents of Pocono Lake, brought this action against Century Oil U.S.A., Inc., ("Century") a New Jersey corporation, in the district court for the Middle District of Pennsylvania pursuant to federal diversity jurisdiction. Jones, the owner and operator of D & L Locksmithing, suffered injuries on the premises of a service station located in Brodheadsville, Pennsylvania in December 1989 shortly after Century leased the property to Gary Fleming. Following an altercation with Fleming in which he was hurt, Jones filed a suit claiming that Centu-ry was liable for his injuries on the grounds that Fleming was Century's agent or employee or, in the alternative, that Century was negligent for failing to supervise its contractor Fleming sufficiently to protect Jones from harm.

A jury trial began on March 18, 1991. On March 19, 1991 at the close of plaintiff's evidence on liability, Century moved orally pursuant to Fed.R.Civ.P. 50(a) for a directed verdict that the trial judge granted from the bench. The ruling was subsequently affirmed in a written order on April 2, 1991. The written order merely stated that "the court concluded that plaintiffs failed in establishing a master-servant relationship or agency relationship to warrant recovery against the defendant Century Oil, U.S.A., Inc." *Jones v. Century Oil, U.S.A., Inc.*, C.A. No. 90–0902, (M.D.Pa. April 2, 1991).

Appellants asked this Court to vacate the district court order and to remand the case for a new trial.

We exercise plenary review of the grant of a directed verdict, and we apply the same standard as would the district court in passing on the motion originally. *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990). A verdict may be directed for a defendant only when there is insufficient evidence from which a jury could reasonably find for the opponent, the court viewing the evidence in the light most favorable to the opponent and giving him the advantage of every fair and reasonable inference. *Laskaris v. Thornburgh*, 733 F.2d 260, 264 (3d Cir.), *cert. denied*, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984). If there is conflicting evidence that could reasonably lead to inconsistent inferences, a verdict may not be directed. *Id.* Viewing all the evidence introduced in the light most favorable to Jones, we cannot conclude that a jury could not have drawn inferences from the facts presented sufficient to support a verdict in appellants' favor. We will vacate the judgment of the district court and remand the case for trial.

## I. BACKGROUND

We review the facts of this case in the light most favorable to Jones.

On November 20, 1989, Century Oil executed an agreement with Gary Fleming to take over the operation of its Brodheadsville Texaco gas station. Century's regional manager, Jay Marshall, obtained the name of Donald Jones' locksmith company from the phone book and called Jones a few days prior to November 20. Marshall advised him that Century was changing dealers at its station and wanted to put in new locks. Jones agreed to do the work with the understanding that he would be paid on the day the work was performed.

On November 20, 1989, Jones went to the station, but only Gary Fleming, the new dealer, was at the premises. Contrary to the understanding Jones had reached in his telephone conversation, Marshall, who had agreed to pay him that day for his work, was not there. Jones did, however, speak to Marshall by phone that day, and Marshall asked him to leave the bill with Fleming, promising that he would be paid the following week. Jones installed the new locks.

However, Jones was not paid the following week. After several telephone conversations with Century's headquarters, and several promises that he would be paid, Jones threatened to remove his locks from the gas station. On December 6, 1989, he drove to the gas station to take the locks out. That day Marshall and Fleming were both there. After some discussion with Marshall and Fleming, Jones started to remove the locks he had installed in the doors. Fleming became verbally abusive and threatening, and ordered him off the premises. Jones refused to leave. While Jones was crouched around the door unscrewing the locks, Fleming walked up to him and, in full view of Marshall, he "slammed" Jones in the shoulder and back.

As a result of being hit in his back, Jones alleges that he suffered herniated discs in his spine, had to undergo surgery, and subsequently became unable to perform his customary occupation.

## II. DISCUSSION

The issue in dispute is the nature of the relationship between Century and Fleming under the applicable law—whether Fleming was, as Century insists, an independent contractor or whether, as Jones asserts, Fleming was an employee or agent of Century. Pennsylvania law governs the determination of their relationship. Accordingly, the determining factor is not the way in which plaintiffs or defendant regards this relationship but "what it really was under the facts and applicable rules of law." *Feller v. New Amsterdam Casualty Co.*, 363 Pa. 483, 489, 70 A.2d 299, 302 (1950).

In defining the distinction between an employee or servant and an independent contractor, the Supreme Court of Pennsylvania held in *Feller* that the "characteristic of the former relationship is that the master not only controls the result of the work but has the right to direct the way in which it shall be done, whereas the characteristic of the latter is that the person engaged in the work has the exclusive control over the manner of performing it, being responsible only for the result." *Id.* at 486, 70 A.2d at 300. "Broadly stated," the Court said, "if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor...." *Id.* The difference between the two relationships turned not so much on "the fact of actual interference or exercise of control by the employer," the Court explained, "but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Id.; accord, Moon Area School District v. Garzony*, 522 Pa. 178, 189–90, 560 A.2d 1361, 1367–68 (Pa.1989).

In *Smalich v. Westfall*, 440 Pa. 409, 415, 269 A.2d 476, 481 (1970), the Supreme Court of Pennsylvania, in distinguishing between the agent whose principal is vicariously liable for harm the agent caused and

the agent whose conduct does not impose liability on the principal, pointed out that the agency relationship that renders the principal liable is that of master-servant. "Thus," the Court stated, "a master not only controls the results of the work but also may direct the manner in which such work shall be done, and a servant, in rendering the agreed services, remains entirely under the control and direction of the master." It is "[b]ecause a master has the right to exercise control over the physical activities of the servant within the time of service, [that] he is vicariously liable for the servant's negligent acts committed within the scope of his employment." *Id.*

Century claims that Fleming was an independent contractor to whom it leased the Brodheadsville Texaco station, as expressed in their signed agreements. Nonetheless, the Supreme Court of Pennsylvania has recognized that "[t]his is not determinative of the matter, for it is the actual practice between the parties that is crucial." *George v. Nemeth*, 426 Pa. 551, 554, 233 A.2d 231, 233 (1967). Trial testimony of Century's President, Mr. DeJonge, concerning Fleming's obligations to Century showed that in numerous respects Fleming's obligations were exactly the same as the gas station's previous operator, an individual Century acknowledged as its employee at what it called a "company run" (App. 34a) station. Trial Transcript at App. 38a–57a. Thus in these respects Century controlled not merely the result but also the manner in which Fleming performed his job under the Dealer's Agreement. According to DeJonge, the following obligations were identical to those of Century's previous employee:

- •• Fleming had to sell only Texaco brand gasoline supplied by Century (App. 38a),
- •• Fleming could not bargain about the price he paid for Century gasoline (App. 39a),
- •• Fleming was to notify Century of any complaints from customers concerning the products he sold (App. 40a),
- •• Century could enter the premises at any time to inspect, repair, adjust or replace the equipment (App. 41a),
- •• Century, in the event of shortages, could allocate unilaterally the amount of gasoline it would sell to Fleming (App. 41a),
- •• Century could terminate the agreement for numerous reasons, including failure to keep the premises safe and clean (App. 42a), failure to keep the station open 7 days a week during prescribed hours, (App. 43a), failure to maintain a minimum purchase of 60,000 gallons a month (App. 47a), and numerous other requirements,
- •• and Century was exclusively responsible for repairs costing more than $250 and for painting the premises (App. 48a).

The details of the Lease Agreement between Century Oil as Landlord and Gary Fleming as Tenant were also brought out in testimony. Certain provisions of the lease clearly indicated that Century exercised control over the *manner* in which Fleming conducted his business. For example, lease provisions required that Fleming:

- •• keep daily records on sales and inventory in the manner prescribed by the Landlord,
- •• pay 3% of all credit card sales of garage repair and motor oil to the Landlord,
- •• and deposit on a daily basis all proceeds, less commission, in the Landlord's bank account at United Penn Bank (App. 30a–31a).

The lease also provided that Century would:

- •• be permitted to audit the meter readings and take physical tank inventory on a weekly basis,
- •• determine and control the posting of retail pump prices,
- •• and determine where and how many vehicles could be parked on the premises (App. 30a–32a).

In significant respects, the relationship outlined between Century and Fleming was similar to that between Exxon and its dealer in the case of *Juarbe v. City of Philadelphia*, 288 Pa.Super. 330, 431 A.2d 1073 (1981). *Juarbe* reversed a summary judgment for Exxon on the issue of liability to a customer who was injured in a fall on the sidewalk where petroleum products had accumulated and remanded the case for trial. The reviewing court held that a jury question was presented on the issue of whether Exxon controlled the manner of achieving the results as well as the results of the dealer's conduct of his business. *Id.* at 340, 431 A.2d at 1078. The court viewed Exxon's power over its dealer under "the threat of termination of the operator's lease and business at the end of a brief term" as evidence of "Exxon's exercise of substantial control." *Id.* at 341, 431 A.2d at 1078.

Both Century and Exxon introduced the documents that they asserted were the full expression of the terms of their dealership, both insisting that the dealer was not an agent or employee, but instead an independent contractor. Both Century and Exxon had executed a lease agreement and a dealership agreement with the station's operator. Yet those terms that in *Juarbe* the court considered indicative of control, *id.* at 336–38, 431 A.2d at 1078, were similar to terms that Century included in its agreements with Fleming.

Century's Dealer Agreement required Fleming to keep the station open from 7:00 a.m. to 9:00 p.m. from Monday through Saturday, and from 8:00 a.m. to 9:00 p.m. on Sundays. (App. 22a). Exxon's agreement required its dealer Davis to keep the station open from 7:00 a.m. to 7:00 p.m. Monday through Saturday. Century's lease agreement required Fleming to maintain the premises in a "neat and business-like manner," (App. 29a) while the agreement Exxon had with Davis required him to keep the station "clean and sanitary." Exxon's agreement required the dealer to keep accurate records of the number of gallons of fuel sold and to permit Exxon to inspect the records; Century required Fleming to keep daily records of the sales and inventory in the manner prescribed and to permit Century to audit the meter readings and to inspect the tanks on a weekly basis. (App. 30a). Both agreements required the dealers to maintain a certain amount and type of liability insurance. In the case of Century, Fleming was to obtain the insurance in the name of the landlord. (App. 28a). Exxon required Davis to provide a sufficient number of attendants; Century required Fleming to hire the manpower necessary to provide adequate service. (App. 30a). In both instances, the agreements listed an extensive number of provisions that, if not fulfilled, were grounds for terminating the dealership agreements. Century's agreement explicitly stated that provisions A through N were "a non-exclusive list of acts or circumstances which shall be deemed to constitute grounds for termination and nonrenewal of this Agreement...." (App. 22a). In *Juarbe* the court concluded that no

clear co-equal independent contractor relationship exists where there is evidence that one party can: randomly inspect the other's operation; compel him to keep it neat and orderly; control his hours of operation; control the type and appearance of clothing worn by him and his employees; require him to adjust customer grievances; set the prices he must charge; specify the quantity and quality of products he must dispense but yet have sole discretion on delivery and allocation of such products; prohibit him from posting unauthorized signs, and compel him not to sell products of a competitor.... Further, it should be stated that while other evidence was presented which arguably further supports Appellant's position on this issue, the matters detailed above were alone sufficient to convince us that error was committed in the granting of summary judgment in this case on the issue of Exxon's potential liability under the theory of respondeat superior.

288 Pa.Super. at 340–341, 431 A.2d at 1078. The factors that were sufficient to persuade the *Juarbe* court to reverse a summary judgement in favor of Exxon also characterized Century's contractual relationship with Fleming.

The court in *Juarbe* distinguished *Green v. Independent Oil Co.*, 414 Pa. 477, 201 A.2d 207 (1964), the case on which the lower court had relied for its analysis of the master-servant relationship. *Id.* 288 Pa.Super. at 341, 431 A.2d at 1079. Century also relied on the holding in *Green* as the basis for its motion for a directed verdict. In *Green* the Pennsylvania Supreme Court held that a gasoline company supplier and a dealer who operated a gas station did not have a master-servant relationship, but instead that their relationship was one between independent contractors. The court reviewing the summary judgment in *Juarbe* found that the holding "in the *Green* case is clearly not controlling of the master-servant issue presented in the instant case because the available evidence in each case may not be equated." *Id.*[1]

*Juarbe* reiterated the rule stated in *Feller, supra*, 363 Pa. at 486, 70 A.2d at 301, that a jury question is presented as to the nature of the relationship between the parties if the facts are in dispute.[2] *See also Melmed v. Motts*, 341 Pa.Super. 427, 430–31, 491 A.2d 892, 893 (1985) (reversing summary judgment granted on issue of whether defendant was vicariously liable for plaintiff's injury caused by a driver who was held to be an independent contractor instead of defendant's employee); *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3d Cir.1978) (reversing summary judgment granted to defendant franchisor of drug store because detailed franchise agreement with franchisor prevented a determination as a matter of law that franchisor did not have right to control manner of franchisee's performance such that franchisor could be vicariously liable for drug store's negligence in filling prescription).

## III. CONCLUSION

It cannot be determined as a matter of law that Century did not have the right to control the manner in which Fleming operated the Brodheadsville Texaco gas station.[3] Viewing the evidence presented in light of Pennsylvania law, we conclude that the directed verdict in favor of Century was granted in error. The decision on whether Century exercised or had the right to exercise sufficient control over Fleming to warrant a finding of liability to Jones should have been made by a jury.

The judgment of the district court will be vacated and the case remanded for trial.

---

1. The instant case is also distinguishable from *Green*. Here, but not in *Green*, the oil company sets the price per gallon of gasoline and the station's hours of operation. Here, the dealer deposits on a daily basis all proceeds from motor fuel sales, less the dealer's commission, into the oil company's bank account; in *Green*, the dealer kept all proceeds, paying the oil company only to purchase its products. Here, the term of the agreement is five years; in *Green*, it was less than one year. Here, the oil company is responsible for all repairs costing in excess of $250; in *Green* the dealer was responsible for all repairs.

2. In *Juarbe*, an expert's testimony that the extent of control exerted by Exxon over its dealer Davis was not fully reflected in and went beyond the terms of the written contracts between the parties created an issue of fact requiring a jury trial.

3. In this case, as in *Juarbe*, there was testimony indicating that the relationship between the parties with respect to the issue of control is not fully reflected in the written agreements, thereby creating a question of fact.