RENDERED: AUGUST 18, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0089-DG

CONSTANCE MOUANDA                                                                        APPELLANT


V.
                        ON REVIEW FROM COURT OF APPEALS
                                    NO. 2019-CA-1594
                        JEFFERSON CIRCUIT COURT NO. 19-CI-000283


JANI-KING INTERNATIONAL;                                                            APPELLEES
CARDINAL FRANCHISING, INC.,
D/B/A JANI-KING LOUISVILLE; AND
JANI-KING LEASING CORP.


**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>REVERSING AND REMANDING</u>**

Jani-King International, Inc. (Jani-King) developed and maintains a proprietary commercial cleaning system that involves selling to master franchisees the right to operate as a Jani-King sub-franchisor in an exclusive territory. These master franchisees, like Appellee Cardinal Franchising, Inc. (Cardinal), in turn sell Jani-King unit franchises to individuals interested in operating a commercial cleaning franchise in the master franchisee's territory. The individuals are generally required to form a limited liability company with the master franchisee. This type of multi-tiered franchise system has become relatively common in the janitorial cleaning industry across the United States.

Appellant Constance Mouanda is the sole member and owner of the assetless The Matsoumou's, LLC (the LLC). After Mouanda formed the LLC for which Cardinal provided all the necessary legal documents, the LLC entered a Franchise Agreement with Cardinal, purchasing the rights to operate as a unit franchisee. Having never realized the profits promised under the Franchise Agreement with Cardinal, Mouanda individually filed suit in Jefferson Circuit Court for fraud, breach of contract, and unconscionability. In addition, she sought damages for Cardinal and Jani-King's failure to comply with Kentucky's wage and hour laws. The trial court granted Cardinal's and Jani-King's motion to dismiss based on Mouanda's failure to bring the suit on behalf of the LLC and the Court of Appeals affirmed. Having granted discretionary review and carefully reviewed the record, we reverse the Court of Appeals and remand this case for further proceedings consistent with this Opinion.

## FACTS

Jani-King was founded as a commercial cleaning company in the 1960s. Since that time, Jani-King has grown into one of the world's largest commercial cleaning franchise companies. Jani-King originally hired employees to perform cleaning services but, beginning in the 1970s, Jani-King shifted its focus to selling franchises. It sells "master franchises," which give the master franchisee the exclusive right to use Jani-King's brand name, reputation, and cleaning system within a defined geographic area. Jani-King is not a party to the franchise agreements between a master franchisee and unit franchisee.

2

Cardinal is a Kentucky corporation and the Jani-King master franchisee for Louisville/Jefferson County and fifteen surrounding counties in Kentucky and Indiana. Master franchisees, like Cardinal, are responsible for selling "unit franchises," training unit franchisees, and securing cleaning contracts (with office buildings, hospitals, hotels, manufacturers, etc.) for unit franchisees to perform. Unit franchisees are the "boots on the ground"—the unit franchisee, either alone or with his/her employees, cleans commercial buildings using Jani-King's prescribed methods, products, and equipment. Master franchisees, like Cardinal, are responsible for ensuring proper use of Jani-King proprietary information in their territory, and if they fail to do so, Jani-King reserves the right to enforce any necessary provisions in Cardinal's unit franchise agreements. Unit franchisees can purchase or lease products and equipment from Jani-King Leasing Corporation, a separate entity from Jani-King International, but are not required to do so.[1]

In 2017, Constance Mouanda, a Congolese immigrant residing in Louisville, Kentucky, inquired about purchasing a unit franchise from Cardinal. According to Mouanda, Cardinal would not sell a unit franchise to her individually. Instead, Cardinal required Mouanda to form a limited liability company to purchase the franchise. Cardinal drafted the paperwork necessary for Mouanda to form The Matsoumou's, LLC (the LLC), and Mouanda executed

---

[1] Although named as a party in Mouanda's complaint, Jani-King Leasing Corporation is not a party to regional or unit franchise agreements and has not sold or leased any cleaning equipment in Kentucky in the last three years. It has not sold or leased any cleaning equipment to Mouanda or the LLC.

the documents on November 11, 2017. Several months later, in February 2018, the LLC entered into a unit franchise agreement with Cardinal (the Franchise Agreement). As is typical in the Jani-King system, Jani-King was not a party to the Franchise Agreement. However, Jani-King's contract with Cardinal reserves Jani-King's right to enforce unit franchise agreements if Cardinal fails to protect its branding. Mouanda, as president of the LLC, paid Cardinal a total of $12,000 for the unit franchise.[2] According to Mouanda, Cardinal assured her that the LLC would earn at least $2,000 per month from the cleaning business referred to her by Cardinal.

In January 2019, Mouanda, individually, sued Cardinal and Jani-King in Jefferson Circuit Court alleging fraud, breach of contract, and unconscionability. Mouanda also sought damages for Cardinal's and Jani-King's failure to comply with Kentucky's wage and hour laws. Specifically, Mouanda alleged that the companies' franchise model was an attempt to circumvent employment law—by labeling janitors as franchisees, Cardinal and Jani-King freed themselves of the obligation to pay minimum wage and provide other employee protections.

Cardinal and Jani-King filed motions to dismiss the complaint. In its motion, Cardinal asserted that Mouanda, individually, lacked standing to bring any claims against it because the Franchise Agreement was between Cardinal and the LLC. Cardinal also asserted that because Mouanda owns an

---

[2] The $12,000 payment to Cardinal includes a $6,000 down payment and $6,000 in franchise fees.

independent franchise through the LLC, which is not a party, she is not an employee but rather an independent contractor employed by her own entity. For its part, Jani-King asserted that it had no contractual or employment relationship with Mouanda or the LLC. Jani-King, a Texas corporation, also argued that Kentucky lacks personal jurisdiction over it.

In response to the motions to dismiss, Mouanda asserted that discovery would likely show that Cardinal is an agent of Jani-King due to the level of control it exerts over Cardinal. Relatedly, Mouanda contended that Jani-King's relationship with Cardinal allowed Kentucky to properly exercise personal jurisdiction over Jani-King. As to the standing issue, Mouanda argued that the fraud and wage and hour claims belonged to her, individually. Specifically, Mouanda claimed that the fraud was perpetrated prior to her required formation of the LLC. She also argued that she was the proper party to bring a wage and hour claim because she, not the LLC, was Cardinal's and Jani-King's de facto employee. Finally, Mouanda acknowledged that the Franchise Agreement was between Cardinal and the LLC. She advised the trial court of her intent to file an amended complaint adding the LLC as a plaintiff for the contract claims, but this was never done before the trial court dismissed for failure to state a claim some five months after the filing of the complaint.

After considering the parties' arguments, the trial court granted Cardinal's and Jani-King's motions to dismiss. The trial court ruled that Mouanda lacked standing to assert the claims in her complaint. In support of that holding, the trial court cited *Turner v. Andrew*, 413 S.W.3d 272 (Ky. 2013),

for the proposition that an LLC's sole member could not assert claims belonging to the LLC. The trial court found that all the claims raised in Mouanda's complaint related to acts that took place after the formation of the LLC and, consequently, the LLC needed to assert those claims. As to Mouanda's assertion that formation of the LLC was part of the fraud, the trial court concluded that formation of the LLC caused no harm to Mouanda. Notably, the trial court made no express mention of Mouanda's wage and hour claims.

Mouanda appealed the dismissal of her complaint and the Court of Appeals unanimously affirmed. The Court of Appeals agreed that Mouanda lacked standing to bring suit and the proper plaintiff was the LLC, the named franchisee in the Franchise Agreement with Cardinal. Unlike the trial court, the appellate court addressed Mouanda's wage and hour claims, but it simply distinguished cases from other jurisdictions where wage and hour claims against Jani-King were allowed to proceed by noting that in those cases the franchisees were individuals as opposed to limited liability companies. Finding the absence of the LLC fatal to all of the claims, the Court of Appeals concluded that the trial court properly dismissed Mouanda's complaint in its entirety.

## ANALYSIS

Motions to dismiss pursuant to Kentucky Rule of Civil Procedure (CR) 12.02 for failure to state a claim are reviewed de novo. *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 651 (Ky. 2019). In ruling on a motion for failure to state a claim, the trial court should take all the allegations in the

6

complaint as true and not dismiss "unless the pleading party appears not to be entitled to relief under any set of facts which could be proven in support of his claim." *Id.* (quoting *Morgan v. Bird*, 289 S.W.3d 222, 226 (Ky. App. 2009)). In addition, all pleadings should be "liberally construed in the light most favorable to the plaintiff . . . ." *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010) (quotations and citations omitted). Notably, the trial court is not required to make any findings of fact, "rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?" *Id.*

## I. Mouanda's Wage and Hour Claims Generally

We begin with whether Mouanda, not the LLC, is the proper plaintiff for the wage and hour claims against Cardinal and Jani-King. First, we recognize the distinction between an LLC and its members. In *Turner*, 413 S.W.3d at 273, the plaintiff filed a lawsuit in his individual capacity, even though the trucking business was operated by an LLC. This Court explained that an LLC and its sole member are not legally interchangeable. *Id.* at 276. In that case, the only proper plaintiff to assert lost business damages was the LLC itself. *Id.* at 278. As the Court explained, "an LLC is not a legal coat that one slips on to protect the owner from liability but then discards or ignores altogether when it is time to pursue a damage claim. The law pertaining to limited liability companies simply does not work that way." *Id.* at 276. However, Mouanda is not asserting a wage and hour claim that, if applicable, belonged to the LLC. Rather, she claims that she, as an individual, was the party injured by the

7

alleged violation of the wage and hour laws. Her claimed damage is that she was deprived of the minimum wage and other worker protections and the existence of the LLC which Cardinal required her to form—indeed formed for her—cannot deprive her of the law's protection.

The Kentucky Wage and Hour Act (KWHA) protects employees from the unlawful wage and hour practices of their employer. Kentucky Revised Statute (KRS) 337.010-.433. For the KWHA to apply, an employee-employer relationship must exist, a relationship which requires an employee and employer and the act or condition of employment. The KWHA adopts the following definitions:

> (d) "Employer" is any person, either individual, corporation, partnership, agency, or firm who employs an employee and includes any person, either individual, corporation, partnership, agency, or firm acting directly or indirectly in the interest of an employer in relation to an employee[.]

KRS 337.010(1)(d).

> (e) "Employee" is any person employed by or suffered or permitted to work for an employer, except that:
>
> 1. Notwithstanding any voluntary agreement entered into between the United States Department of Labor and a franchisee, neither a franchisee nor a franchisee's employee shall be deemed to be an employee of the franchisor for any purpose under this chapter; and
>
> 2. Notwithstanding any voluntary agreement entered into between the United States Department of Labor and a franchisor, neither a franchisor nor a franchisor's employee shall be deemed to be an employee of the franchisee for any purpose under this chapter.

KRS 337.010(1)(e). Although the KWHA was created over 80 years ago, a 2017 amendment to its definitions resulted in the explicit exclusion of franchisees and their employees from qualifying as employees of the franchisor.

Jani-King and Cardinal insist that the plain language of KRS 337.010(1)(e)1 precludes Mouanda's KWHA claim but our application of that language to these facts causes us to conclude otherwise. The statute provides that "neither a franchisee nor a franchisee's employee" can be an employee of the franchisor, language Jani-King and Cardinal as the franchisor and sub-franchisor claim protects them from any employment relationship with Mouanda. The franchisee in this case, however, is not, as Jani-King and Cardinal have repeatedly pointed out, Constance Mouanda, but rather the LLC they required and formed for her. Additionally, nothing in the record suggests that Mouanda is an employee of the LLC rather than its sole member/owner.[3] If Cardinal had contracted with Mouanda individually (making her the "franchisee") or if she was the employee of a Jani-King franchise owned by others (making her a "franchisee's employee"), the exclusionary language of KRS 337.010(1)(e)1 would be applicable. As it is, the language does not place Mouanda beyond the scope of the KWHA but rather requires consideration of the more commonly encountered issue of her status, whether she is in fact an employee or an independent contractor.

---

[3] As discussed below, the Franchise Agreement did not recognize Constance Mouanda as an employee of the LLC but instead deemed her a "principal."

9

As noted, Cardinal required Mouanda to form a limited liability company in order to participate in the Jani-King janitorial system and it then provided the LLC's Articles of Organization, a corporate resolution authorizing the LLC to contract with Cardinal, a waiver of notice of a Board of Directors' meeting and other legal documents for Mouanda to sign. Cardinal, the "Franchisor," and The Matsoumou's, LLC, the "Franchisee," then entered a Franchise Agreement, which expressly states in paragraph 12.6:

> The Parties agree and understand that **Franchisee will be at all times an independent contractor under this Agreement** and will not, at any time, directly or indirectly, hold itself out as an agent, servant, or **employee of Franchisor.** Nothing in this Agreement may be construed to create a partnership, joint venture, agency, **employment,** or fiduciary relationship of any kind. **None of Franchisee's employees will be considered to be Franchisor's employees. . . .**

(Emphasis added.) To the extent Cardinal and Jani-King rely on this contractual provision as a bar to Constance Mouanda's attempted KWHA claims, we note that it requires the same end result as the exclusionary language in KRS 337.010(1)(e), i.e., it has nothing to say about the individual, Constance Mouanda. The LLC is the "Franchisee [which] at all times will be an independent contractor under this Agreement." As for the last sentence, "[n]one of Franchisee's employees will be considered to be Franchisor's employees," once again Mouanda is not an employee of the Franchisee but rather the sole owner/member of the Franchisee.

The distinction between Mouanda and a "Franchisee employee" as referenced in paragraph 12.6 is underscored by a review of the Franchise Agreement which identifies in paragraph 4.2.3 "[a]ll of Franchisee's owners,

10

shareholders, members, managers, officers and directors" as "each a 'Principal' and collectively the 'Principals.'" In other instances (e.g., paragraph 4.2.2) the Franchise Agreement refers to the Franchisee's "agents and employees." In short, the parties' agreement explicitly acknowledges that Mouanda, as an LLC owner, is not an employee of the LLC. Thus, the final sentence in paragraph 12.6 that declares none of the Franchisee's [LLC's] employees can be considered to be the Franchisor's [Cardinal's] employees also does not apply. In short, to the extent the parties' contract is deemed relevant to Constance Mouanda's individual employment status, if any, vis-à-vis Cardinal or Jani-King, the Franchise Agreement simply does not address that issue.

## II.   The Classification of an Individual as an Employee Or Independent Contractor Controls the Availability of Protections under Wage And Hour Laws

Franchisor and franchisee relationships, particularly the multi-tiered structure of franchising relationships utilized by Jani-King, create complexities in employment law. Generally, "franchising is . . . a unique, modern, multitier marketing device used by independent, but mutually dependent, businesspeople bound in contractual relationships."[4] A franchisor typically provides the franchisee with a written license to use the franchisor's proprietary marks, business format, and methods.[5] Initial training and

---

[4] Dean T. Fournaris, *The Inadvertent Employer: Legal and Business Risks of Employment Determinations to Franchise Systems*, 27 Franchise L.J. 224 (2008).

[5] *Id.*

11

ongoing advice or field support may also be offered, in exchange for some form of initial and recurring fees.[6]

Typically, franchisees maintain a degree of independence, such as controlling day-to-day operations, hiring and firing their own employees, and choosing their own customers and pricing.[7] The legal aspects of a franchise relationship are intricate, and ideally all parties to the relationship understand the potential legal implications of such an arrangement. As a result of the often-unique franchisor and franchisee relationships (including sub-franchisors), the workplace has become progressively complex, and positioning individuals in the context of employment law requirements and protections is increasingly difficult. One primary distinction is that of an employee from an independent contractor. Designation as an employee or independent contractor determines an individual's entitlement, or lack thereof, to many statutory employment protections. Many claims involving classification as either an employee or independent contractor occur in federal court because of the protections afforded by the Fair Labor Standards Act (FLSA).

a. **The Fair Labor Standards Act**

To improve the workplace, the FLSA, created in 1938, establishes the minimum wage, regulates overtime eligibility, requires recordkeeping and sets other labor standards. 29 United States Code Chapter 8, §§ 201-19. Kentucky's wage and hour laws as codified in KRS Chapter 337 are the

---

[6] *Id.*

[7] *Id.*

analogue to the FLSA. *City of Louisville, Div. of Fire v. Fire Serv. Managers Ass'n ex rel. Kaelin*, 212 S.W.3d 89, 92 (Ky. 2006). In discussing the legislative history of the FLSA, the United States Supreme Court explained that the Act

> shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided.

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945). Further, the legislative debates "indicate that the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Id.* at 707 n.18 (citations omitted). The comprehensive nature of the protections provided by the FLSA makes the distinction between independent contractors and employees vitally important.

Under the FLSA, employees are entitled to overtime and minimum wage compensation while independent contractors are not. *Keller v. Miri Microsystems, LLC*, 781 F.3d. 799, 806 (6th Cir. 2015). From a federal standpoint, a franchisee is generally classified as an independent contractor, but "may be entitled to the protections of the FLSA if it is able to allege an

13

employer-employee relationship with the franchisor."[8]  To determine whether an individual is an employee or an independent contractor, many courts have applied the well-established economic realities test, which focuses on the economic interactions between workers and an employer beyond the plain terms of a contract.[9]  The economic realities test was formed in response to the FLSA's failure to clearly define the differences between an independent contractor and an employee.

Federal law lacks a substantive statutory scheme to clarify the difficulties in distinguishing employees from independent contractors.  Additionally, the United States Supreme Court has not officially recognized a test or rule for distinguishing between employees and independent contractors.  Many states have addressed the issue by adopting and applying various classification tests.[10]  Some federal Courts of Appeals have adopted and applied the

---

[8] *Fair Labor Standards Act*, 14 Bus. & Com. Litig. Fed. Cts. § 150:60 (5th ed.).

[9] Stephanie Sullivant, *Restoring the Uniformity: An Examination of Possible Systems to Classify Franchisees for Workers' Compensation Purposes*, 81 UMKC L. Rev. 993, 1006 (2013).

[10] Other tests for classifying individuals as employees or independent contractors are the control test, and the relative nature of the work test.  First, the control test requires employers to prove "that the services at issue are performed (a) free from control or direction of the employing enterprise; (b) outside of the usual course of business . . . ; and (c) as part of an independently established trade, occupation, profession, or business of the worker."  *Coverall N. Am., Inc. v. Com'r of Div. of Unemployment Assistance*, 857 N.E.2d 1083, 1087 (2006) (quoting *Athol Daily News v. Bd. of Review of the Div. of Emp't & Training*, 786 N.E.2d 365, 369 (2003)).  Under the relative nature of the work test, the classification of an individual depends on "the nature of the claimant's work in relation to the regular business of the employer."  *Hannigan v. Goldfarb*, 147 A.2d 56, 64 (N.J. App. Div. 1958).  The test considers "whether the work done is an integral part of the employer's regular business; and whether the worker in relation to the employer's business is in a business or profession of his own."  *Id.*

economic realities test.[11]  The Sixth Circuit has interpreted the FLSA

framework by recognizing its legislative purpose and concluding that

"employees are those who as a matter of economic reality are dependent upon

the business to which they render service."  *Donovan v. Brandel*, 736 F.2d

1114, 1116 (6th Cir. 1984) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d

139, 145 (6th Cir. 1977)).  Thus, the Sixth Circuit identified six factors to

consider:

> 1) the permanency of the relationship between the parties;
>
> 2) the degree of skill required for the rendering of the services;
>
> 3) the worker's investment in equipment or materials for the task;
>
> 4) the worker's opportunity for profit or loss, depending upon his skill;
>
> 5) the degree of the alleged employer's right to control the manner in which the work is performed; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Keller*, 781 F.3d at 807 (quotations and citations omitted).  No one factor is

determinative and "a central question is the worker's economic dependence

upon the business for which he is laboring."  *Id.*

Although Kentucky has not addressed the employee/independent

contractor distinction under the KWHA, considering economic realities for

---

[11] *See, e.g., Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1160 (10th Cir. 2018); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985); *Real v. Driscoll Strawberry Assoc.*, 603 F.2d 748 (9th Cir. 1979).  The United States Supreme Court first described what is now known as the economic realities test in *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), but the test was explained in dicta.

employment classification purposes is not entirely new in Kentucky.  In

*Stewart v. University of Louisville*, 65 S.W.3d 536, 539 (Ky. App. 2001), a

graduate student was dismissed from a fellowship program and the Court of

Appeals was tasked with determining whether the student was an "employee"

for purposes of her discrimination claims.  The appellate court examined the

economic realities underlying the relationship and ultimately concluded it was

not an employer-employee relationship.  *Id.* at 540.[12]  In *Ratliff v. Redmon*, 396

S.W.2d 320 (Ky. 1965), this Court's predecessor outlined nine factors used to

determine whether an individual is an employee or an independent contractor.

The *Ratliff* test is consistent with the economic realities test and includes five of

the same factors as the Sixth Circuit test.[13]

---

[12] *See also Burkich v. Com., Cab. for Health and Family Servs.*, 2005-CA-000333-MR, 2006 WL 2574024, at *2 (Ky. App. Sept. 8, 2006) (To determine whether an individual is an "employee" for Title VII purposes, one must examine the economic realities "to determine whether that individual is likely to be susceptible to the discriminatory practices which the act was designed to eliminate.").

[13] The *Ratliff* factors for determining whether an individual is an employee or an independent contractor are:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

The relationships between Jani-King, Cardinal, the LLC, and Mouanda bear the potential for misclassification. We note that several cases across the United States allege that Jani-King and similarly-structured janitorial companies use franchise models to evade obligations to individuals who qualify as employees under labor laws. To provide a framework for analyzing whether Mouanda may be deemed an employee of Jani-King or Cardinal, we turn to other jurisdictions for guidance.

### b. Multi-Tiered Franchising Relationships And Classifications in Other Jurisdictions

Mouanda is far from the first plaintiff to challenge Jani-King's business structure. In *Acosta*, 905 F.3d at 1158, the United States Secretary of Labor filed a complaint alleging that Jani-King of Oklahoma violated the FLSA by failing to keep employee records for the individuals performing janitorial work as unit franchisees (i.e., people like Mouanda). The Secretary's complaint noted that Jani-King had recently begun requiring individuals to form corporate entities to execute unit franchise agreements with Jani-King. *Id.* The complaint further alleged that the "individuals who form corporate entities

---

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

and

(i) whether or not the parties believe they are creating the relationship of master and servant.

*Ratliff*, 396 S.W.2d at 324-25.

17

and enter franchise agreements as required by Jani-King nonetheless personally perform the janitorial work on behalf of Jani-King and, based on the economic realities of this relationship, are Jani-King's employees under the FLSA."[14]  *Id.*

Jani-King moved to dismiss the Secretary's complaint for failure to state a claim, "arguing that the Secretary is not free to ignore [the franchisees'] corporate organization[s]."  *Id.*  The district court agreed with Jani-King and determined that the Secretary's complaint "failed to state a claim because a corporate entity can never be an 'individual,' which is a statutory prerequisite to status as an 'employee.'"  *Id.* at 1159.  The Secretary appealed, and the Tenth Circuit reversed because the district court's rationale ignored the economic realities test.  *Id.*  The Tenth Circuit noted that the purpose of the economic realities test, which is used for determining whether an individual is an employee under the FLSA, is to examine the true nature of an individual's working relationship with the purported employer, rather than relying on the contractual label or structures applied to the relationship.  *Id.*  The Court held that the facts in the Secretary's complaint identified individuals who might be employees under the economic realities test.  *Id.* at 1161.  Because the district

---

[14] In fact, that complaint by the Secretary of Labor describes Jani-King of Oklahoma as follows:

> Defendant structures its business in a way that attempts to avoid providing its workers with the protections afforded by the FLSA.  Rather than properly classifying its cleaners as employees, Defendant deems these workers independent franchise owners, and therefore outside the scope of federal wage and hour protections.

18

court erroneously ruled that it could not look behind the corporate structures required by Jani-King, the Tenth Circuit reversed and remanded for further proceedings. *Id.* at 1162.[15]

In this case, the Court of Appeals rejected Mouanda's reliance on *Acosta* because "the *Acosta* Court did not decide whether an individual has standing to pursue a claim after the formation of an LLC, but merely held that the Secretary of Labor had survived the motion to dismiss . . . ." While the Tenth Circuit did not explicitly answer the question of standing, it held that the complaint (which alleged the same claims or similar to Mouanda's) survived a motion to dismiss because the individuals "who personally perform the janitorial cleaning work" could plausibly be "employees" under the economic realities test. 905 F.3d at 1161.

In another Jani-King case, the Third Circuit Court of Appeals upheld the class certification in a claim filed on behalf of nearly 300 Jani-King franchisees in Philadelphia alleging violations of Pennsylvania wage payment and collection law. *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 319 (3d Cir. 2016). The dispute hinged on whether workers were properly classified as employees or independent contractors. *Id.* at 316. Citing its prior decision in *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 784 (3d Cir. 1978), the Third Circuit stated

> the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically

---

[15] On remand, the parties proceeded with discovery. As of August 8, 2022, the case remains pending on cross-motions for summary judgment.

19

> insulate the parties from such a relationship. Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties.

*Williams*, 837 F.3d at 324-25. The Court declined to weigh in on the merits of the wage claim, reasoning that the class certification stage is not the place for merit-based decisions. *Id.* at 322. Ultimately, after the decade-long class action suit, the parties reached a settlement agreement in which the Jani-King defendants agreed to pay $3.7 million, compensating the franchisees for their misclassification as independent contractors.[16]

In *Vazquez v. Jan-Pro Franchising International, Inc.*, 986 F.3d 1106, 1110 (9th Cir. 2021), the Ninth Circuit referenced cases dating back to 2008 involving Jan-Pro, another major international janitorial cleaning business. Under its business model, Jan-Pro contracts with "master franchisees" (regional, third-party entities), who in turn sell business plans to "unit franchisees." *Id.* at 1111. Master franchisees provide their unit franchisees with initial business, equipment, and cleaning supplies. *Id.* The franchise agreements make it clear that unit franchisees are independent contractors. *Id.* The *Vasquez* case involved numerous plaintiffs from various states with a common cause to pursue, namely that Jan-Pro had developed a sophisticated "three-tier" franchising model to avoid paying its cleaners minimum wage and

---

[16] The United States District Court for the Eastern District of Pennsylvania granted plaintiffs' Unopposed Motion for Preliminary Class Action Settlement. *Myers v. Jani-King of Philadelphia, Inc.*, No. 09-1738, 2019 WL 2077719, at *4 (E.D. Pa. May 10, 2019).

overtime compensation by misclassifying them as "independent contractors." *Id.* at 1110.[17]

The *Vazquez* plaintiffs were unit franchisees who filed a class action alleging that Jan-Pro Franchising International, which entered into franchise agreements with master franchisees, used its multi-leveled franchise model to misclassify them as independent contractors, rather than employees, and thus could avoid paying them minimum wage and overtime. *Id.* at 1118. The Ninth Circuit explained the retroactive application of *Dynamex Operations West, Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018), in which the California Supreme Court adopted the "ABC test" for determining whether workers are independent contractors or employees under California wage laws.[18] *Vazquez*, 986 F.3d at 1109. Because the lower court had no opportunity to consider whether

---

[17] According to the Court, the National Employment Law Project asserted "a strong interest in this case because of the impacts of [Jan Pro's] franchising schemes and those of similar janitorial companies on low-wage and immigrant workers and their communities . . . ." *Vazquez*, 986 F.3d at 1110.

[18] Under the ABC test, which is also called the control test, all workers are presumptively employees, and not independent contractors, unless the hiring entity satisfies all three of the following:

> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*
>
> (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and*
>
> (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Dynamex*, 416 P.3d at 41.

plaintiffs were employees or independent contractors under the *Dynamex* standard, and neither party had the opportunity to supplement the record regarding the *Dynamex* criteria, the Ninth Circuit remanded the case for the lower court's consideration. *Id.* at 1122. In doing so, the Court emphasized the fact-intensive nature of such inquiry and noted that the lower court should consider the classification with the benefit of a more developed record. *Id.*

In another case involving Jan-Pro, *Depianti v. Jan-Pro Franchising International, Inc.*, 990 N.E.2d 1054, 1058 (Mass. 2013), Depianti, a janitorial cleaning services franchisee, along with others, filed a class action suit against Jan-Pro Franchising International, Inc., claiming that Jan-Pro misclassified them as independent contractors and committed wage law violations. Depianti contracted with Bradley Marketing Enterprises, a Jan-Pro regional master franchisee, to purchase a unit franchise. *Id.* at 1059. The Supreme Judicial Court of Massachusetts was tasked with determining, among other issues, whether a contract between Jan-Pro and Depianti was a necessary element for a claim for misclassification under the Massachusetts independent contractor statute. *Id.* at 1065. That statute outlines whether a person providing services is a statutory employee, and thus entitled to wage and hour protections, or an independent contractor and therefore exempt from those protections. Mass. Gen. Laws ch. 149, § 148B.

In considering that question, the Supreme Judicial Court of Massachusetts reasoned that

22

[a]ssuming without in any way suggesting that Depianti was working as an employee of Jan–Pro, and not as an independent contractor, Jan–Pro's contractual arrangement with Bradley, if enforceable, would provide a means for Jan–Pro to escape its obligation, as an employer, to pay lawful wages under the wage statute . . . .

*Id.* at 1068. The court concluded that "the lack of a contract for service between the putative employer and putative employee does not itself preclude liability" under the independent contractor statute. *Id.* at 1069. The court further explained its reasoning with a hypothetical:

[C]ompany A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A. We agree that ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers. This is because ordinarily, in such circumstances, company B would be the agent of any misclassification. However, here Depianti alleges that Jan–Pro, and not Bradley, designed and implemented the contractual framework under which he was misclassified as an independent contractor. The lack of a contract between Depianti and Jan–Pro does not itself preclude liability. Where a party is the agent of misclassification, it may be directly liable under [the independent contractor statute] even where it utilizes a proxy to make arrangements with its employees.

*Id.* at 1068 n.17.

While *Vazquez and Depianti* did not involve Jani-King International or any of its master franchisors, the Jan-Pro business model and multi-tiered structured franchise approach appears very much like the Jani-King model.[19]

---

[19] Other courts have examined franchising arrangements and what effect those arrangements have on an individual's status as an employee or independent contractor. *See Jason Roberts, Inc. v. Adm'r,* 15 A.3d 1145, 1150 (Conn. App. 2011) (existence of a franchise agreement did not exempt the employment relationship from the application of the ABC test or purview of the unemployment compensation act); *Coverall,* 857 N.E.2d at 1087 (franchisor could not meet its burden of establishing that franchisee was an independent contractor); *Hayes v. Enmon Enters.,*

Applying the reasoning in *Depianti,* the nonexistence of a contract between Mouanda individually and Jani-King or Cardinal does not automatically preclude Jani-King or Cardinal from liability for wage and hour claims. These employment relationships are complex and determining each party's status requires more than examination of the documents signed by the parties and, to reiterate, prepared by Cardinal and Jani-King. As in *Vazquez,* since the trial court dismissed Mouanda's claim less than six months after she filed her complaint, the record is undeveloped. The trial court should have the benefit of a more developed record to conduct the fact-intensive inquiry necessary to determine Mouanda's true legal status.

### III. A Fact-Intensive Examination of Mouanda's Status Is Required

The foregoing cases illustrate that the distinction between employees and independent contractors is often blurred, especially in the realm of franchise agreements. Clearly, a business entity cannot use the labels of "franchisor" and "franchisee" to avoid employment law and regulation. Instead how the parties functioned and conducted their businesses must be analyzed and mere reliance on their contract labels is inappropriate. The Franchise Agreement alone suggests that Cardinal maintained a significant degree of control over the

---

*LLC,* No. 3:10-CV-00382-CWR-LRA, 2011 WL 2491375, at *6 (S.D. Miss. June 22, 2011) (Although the Franchise Agreement between Jani-King and an LLC performing cleaning services suggested an independent contractor relationship, the degree of control over the LLC's physical conduct was too great to pass off as creating an independent contractor. The existence of this genuine issue of material fact defeated Jani-King's motion for summary judgment.).

day-to-day activities of the LLC (and therefore Constance Mouanda individually as the "principal") in performing cleaning services. Some of the notable provisions are:

> Retention and ownership of any improvements to Jani-King systems or new concepts developed by the LLC. 4.26.

> Requiring Franchisee [(the LLC)] to follow established Jani-King policies, practices and procedures and to not deviate therefrom without prior written consent of Franchisor [(Cardinal)]. 4.2.2.

> Cardinal's exclusive right to perform all billing and accounting functions for all services provided by the LLC; for an Accounting Fee[20] of 4% of the LLC's monthly gross revenue. 4.7.

> Franchisor may inspect or examine the accounts, books, records, and tax returns of Franchisee at any reasonable time. 4.9.2.

> If there is a deficiency in Franchisee's cleaning work which Franchisor rectifies, there is a $50 per hour Service Fee plus travel and expenses to send a representative of Franchisor to correct the work. 4.18.4, 4.23.

> Franchisor must approve any office location, furniture, and décor thereof to protect the image and reputation of Jani-King. Franchisee must, within a reasonable time as specified by Franchisor, make all necessary additions, alterations, repairs and replacements to office as required by Franchisor, but no others without Franchisor's prior written consent. 4.11.1.

> Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards. 4.18.

> If a deficiency in performance is discovered which requires action to meet a customer's demand in less than four hours and Franchisor is not able to reach Franchisee or Franchisee is not available for an immediate visit or performance of services,

---

[20] In addition to the Accounting Fee, Cardinal charged an Advertising Fee (2% of the Franchisee's Gross Revenue); a Royalty Fee (10% of Gross Monthly Revenue); a Technology Fee (2% of Franchisee's Gross Revenue); and other fees over and above the monthly Franchise Fee.

Franchisor can dispatch Franchisor's own staff to correct all deficiencies in performance. 4.18.5.

Franchisor reserves the right to take over any job in which it views Franchisee's work to be inadequate. Franchisee will not be offered the right to service an additional account to replace the cancelled or transferred account. 4.18.

Each of Franchisee's representatives must be in an approved, clean uniform at any time they are performing services. 4.18.1.

Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement. 4.24.

Franchisee shall be deemed in default, and Franchisor may terminate the Agreement without affording Franchisee any opportunity to cure the default upon notice of the occurrence of seventeen different events. 8.1.

In assessing the true nature of the parties' relationship, courts must look at the practical, not just contractual, realities of the relationship between Jani-King, Cardinal, the LLC, and Mouanda. Mouanda alleges that Cardinal never offered her enough cleaning contracts to fulfill its obligations to the LLC under the Franchise Agreement and states:

Defendant's "franchisees" are in fact laborers due to the virtue of the extensive control of Defendant over laborers, economic realities of laborers, relationship of laborers to the enterprise, and other factors courts consider when investigating pretextual independent contractor relationships.

These allegations and others in Mouanda's complaint are sufficient to survive a motion to dismiss and the trial court erred in dismissing the wage and hour claims on the erroneous premise that any such claims belonged to the LLC. On remand, the trial court must apply the economic realities test and examine the true nature of the individual's (Constance Mouanda's) working

26

relationship with the purported employer, rather than relying on the contractual label or structures applied to the relationship. *Acosta*, 905 F.3d at 1159-60. The LLC structure which Jani-King and Cardinal mandated and created for Mouanda is no bar to a Kentucky wage and hour claim if she is actually an employee.

> We recognize
>
> the settled law in Kentucky [is] that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud.

*Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)). But, as we have explained, nothing in the Franchise Agreement precludes a wage and hour claim by Constance Mouanda who is neither the Franchisee nor the Franchisee's employee.

### IV. The Fraud Claim Was Not Dependent on the LLC Being a Party to the Action

The breach of contract and unconscionability claims asserted by Mouanda were in fact claims that should have been asserted by the contracting party, The Matsoumou's, LLC, so the trial court's dismissal was legally correct. The fraud claim, however, is not one that belongs solely, if at all, to the LLC. Liberally construing the Complaint in the light most favorable to Mouanda, *Fox*, 317 S.W.3d at 7, she alleges material misrepresentations from the inception of her interactions with Jani-King/Cardinal, conduct that preceded the mandatory formation of the LLC which Cardinal created and the LLC's signing of the Franchise Agreement. Consequently, the trial court erred

27

in dismissing the fraud claim without allowing Mouanda to develop facts relevant to that claim through discovery.

In sum, the Franchise Agreement itself contains nothing that would preclude a wage and hour claim by Constance Mouanda individually. Even if the Franchise Agreement could be read to address Constance Mouanda individually, Kentucky courts should look beyond that agreement and the Jani-King/Cardinal-mandated limited liability company to the economic reality of the situation, as have other jurisdictions faced with this particular business scheme. On remand, discovery will allow the parties to develop the record so the trial court can determine whether Mouanda has a valid wage and hour claim and/or fraud claim.

## CONCLUSION

Based on the foregoing, we reverse the Court of Appeals, and remand this case for further proceedings consistent with this Opinion.

All sitting. All concur.

28

COUNSEL FOR APPELLANT:

Ryan Fenwick
Amy S. Foster

COUNSEL FOR APPELLEES,
JANI-KING INTERNATIONAL
AND JANI-KING LEASING
CORP.:

Raymond C. Haley
Paul E. Goatley
FISHER & PHILLIPS LLP

COUNSEL FOR APPELLEE,
CARDINAL FRANCHISING, INC.,
D/B/A JANI-KING LOUISVILLE:

Randall S. Strause
Andrew J. Williams
Randall S. Strause, Jr.
STRAUSE LAW GROUP, PLLC